Good morning, Your Honors. My name is Mark Tovaroff. I represent the plaintiff Laura Siegel Larson. I'd like to reserve 10 minutes of my 20 minutes for rebuttal, if I may. The Copyright Act's termination provisions were designed to remedy the tremendous imbalance of power between author-creators and media companies, and to give an author and an author's family the opportunity, after a very long waiting period, to participate in the increased market value of their works by finally recovering their copyrights for the extended renewal term. This case has become emblematic of the kind of war of attrition an author's family must endure before vindicating those rights. I'm going to first turn to Warner Bros. alleged settlement agreement defense. Warner Bros. defense is based on a false construct that it can artificially limit the legal analysis to a single October 19th letter from the Siegel's attorney, and call that a contract, regardless of the differing terms in Warner Bros. October 26th counteroffer, and vastly different terms in Warner Bros. February 1st counteroffer, which were part and parcel of the exact same contract negotiation. The cases Warner Bros. relies on are inapposite, particularly the Facebook case. In the Facebook case, unlike here, you had a binding contract signed by the parties. That contract also contained a stipulation saying that it would be binding and enforceable in a court of law. So the question before the Ninth Circuit was whether the terms of that contract were sufficiently definite to be enforceable. And, of course, this court, since it basically called for the payment of fixed amounts of cash and stock, found that it was enforceable. None of that exists here. After the terminations or something else. Are you saying there was no contract or that the contract, if it existed, was not a – got a contract that could be enforced? There was no contract signed by the party. No, I said that's your first contention, that there's no contract. Is there a second contention or is that the issue, whether there was a contract? In this case, the issue is whether there's a binding contract. Okay. So here, after the effective date of the settlement of the Segal's termination in April of 1999, on-again, off-again settlement discussions ensued. And on October 9th, John Shulman, on behalf of Warner Brothers, their general counsel, and Kevin Marks, on behalf of the Segal's, held a telephone conference. On October 16th, Marks sends over a letter purporting to set forth the terms that were discussed on October 16th. On October 19th, in his letter, he's going over the terms. But it's an equivocal letter because at the end he says, John, if I got anything wrong, please let me know. Why do you say that's equivocal? Because it shows at the very beginning it's indefinite because he's unsure if those are the terms. That's using typical line, which makes this what I see. I mean, the response to it, if they had written back and said, no, you're right, you'd have to agree that there's a contract, right? That could be the case. Well, what do you mean could be the case? If you said this is absolutely right, this is a contract, we agree to. Wouldn't that be enough? It's further along than the facts here, but what happened here is that. No, that I know, but that wasn't the question. Okay. All right. So this could be the contract if the parties agreed to it. That's correct. If the party agreed to the material terms, you could have a contract. Yeah. So you don't think that it's proper for a lawyer who says this is a contract we agreed to, if you have any question about it? I don't think it's improper at all, but I don't think that forms it. I mean, that shows uncertainty? It's not an unequivocal acceptance of terms, but leaving that. No, it's a statement of the terms. It's a statement of what he perceived the terms as discussed in October 16th. On October 26th, Shulman writes back while he goes, Marx then goes off to China. On October 26th, Shulman writes back and in effect says, you got it wrong, and closes a more fulsome outline of what we believe the terms of the deal are. That constitutes a counteroffer because the terms outlined in the October 26th letter from Shulman materially differ from the terms in the October 19th letter from Marx. A counteroffer in the State of California extinguishes Marx's offer. Marx's offer itself is a counteroffer because he reports to accept an offer on October 16th that Shulman then tells him was never made. You could stop right there. I didn't say that. He said that's a more fulsome outline. I mean, we have a – there are sort of two issues. One is, did the parties ever agree to the terms? And two, were the terms embodied in the first letter? And should a court enforce that? And we've had – there are cases that go a little bit all over the map on that, but, I mean, there are a lot of cases in which you say, all right, we know you added some terms, but this is the agreement the court's going to enforce, and it's the simple agreement as to terms. So what tells you that they're making a true counteroffer as opposed to adding a bunch of conditions that a court could later say, well, we're not going to put those in because obviously the parties didn't agree to them? Well, there's no agreement by Warner Brothers as to the terms set forth in his letter. In fact, there's disagreement. There's disagreement as to the properties that are being assigned. There's disagreement as to the essential term of compensation, which you're dealing with a – you're not dealing here with a payment of cash and stock. You're dealing with a complex royalty system applicable to multiple media where you're dealing with marks that says we will not identify Warner Brothers, we'll only warrant we haven't sold these rights to someone else, and Warner Brothers adding six or seven warranties with indemnifications attached. Well, they both sides agreed that they had agreed to a contract. No. Both sides perceived that they had a deal in principle, and the cases have said that the deal in principle does not make a binding contract. What happens is in his October 26th counteroffer, Shulman doesn't stop there, but he makes reference and incorporates by reference a February 1st draft that then comes in and widens the gap between the parties even further. On May 9th, Joanne Siegel reacts to the new and different terms that are being added by Warner Brothers and rejects those terms and says there is no agreement. And on May 26th, she wrote a letter to the CEO of Time Warner, Dick Parsons. On May 26th, 2002, Dick Parsons writes back and acknowledges that they have no agreement. He says we hope the parties can arrive at an agreement. From that point on, from October 19th of 2001 until we filed suit in October of 2004, Warner Brothers not once said that we have an agreement and we accept the terms in the October 19th letter. They were totally silent for three years about that. They came up with this concocted defense when we filed suit to enforce the termination right. So you've described a lot of factual considerations. Why isn't this a matter for trial as opposed to summary judgment? Because contract formation is based on the objective manifestations of the party's intent. And here you have that objective manifestation in the form of three or four undisputed documents, the October 19th offer or counteroffer, the October 26th counteroffer, the February 26th counteroffer, the May 9th rejection and the May 26th letter in response to acknowledging that there's no agreement. Warner has not come up with anything that creates a genuine issue of material fact. It was the Court not only was allowed to rule on summary judgment, it was required to rule on summary judgment. Why do you say that, required? Because based on, based on this undisputed objective manifestation of the party's intent, there was no meeting of the minds on the material terms. The Court rightly said, I can point to no document that contains the party's agreement. Warner Brothers, a negotiation is a give and take. You can't take an offer, you can't go back, freeze in time, and take an offer that a party made, a proposal, that you, eviscerated by a counteroffer, continue to grind the other side in negotiations, and when that fails, reach back and try and resuscitate a offer that has been extinguished by a counteroffer. Well, an agreement was reached according to your client's lawyer, and he advised the other side on August 9th that, I must caution, I believe an agreement was reached last October, albeit subject to documentation. So the issue was whether the documentation reflected the agreement. The contract fell apart, as many contract negotiations, in the attempt to focus on the details of the agreement. There was an agreement, and then there was a dispute over the details, the documentation of it. No, there was a deal in principle, but that deal in principle, for instance, involved a 6% royalty. That 6% royalty had all sorts of sliding scale reductions. There were exclusions as to revenues to which that royalty would apply or would not apply. You had very important issues dealing. I'll give you an easy example of these studio agreements, is that you have a series of warranties that have indemnifications attached to them, and if someone has breached that warranty, they withhold the money on the royalty. No, I understand that. The question is not whether that's an unusual term. The question is whether it was contained in the October 19th letter, and here he's saying there will be no indemnification from the Seagulls. So the question is, does that become a material term of the agreement? And it certainly is a material term. The fact you have such indemnities customarily in agreements, I would submit, is not the issue. The question is, did they agree to it on October 19th, and they didn't. Did Warner Brothers make that the condition of an agreement? Yes, they did. And if these ñ you know, people say a deal's a deal precisely when they don't have a binding contract. If these terms were not material to Warner Brothers, then why did they insist upon them? If a deal's a deal, then why did they go ñ why didn't they just accept the October 19th recitation of the terms, and why did they continue to grind the Seagulls in their October 26th outline and in a horrendous contract? If you ñ the same attorney, Marks, who sent that attorney-client communication which ordinarily would have been privileged but for the fact it was stolen from my law offices, the same attorney that wrote that testified at length at deposition why, although he thought there was a deal, there was no binding of contract, and he goes term by term by term in sworn testimony comparing the huge gaps between the parties that had developed. You can't form a contract for the parties. The parties have to form a contract themselves. Nor can you go back and arrest the legal analysis. I understand what that means. You can't form a contract between the parties if you're their representative? No. A court cannot write a contract for the parties when the parties themselves cannot agree upon the terms. No. The only question is whether they had an agreement in the earlier deal. That's the question. And whether then there was a counteroffer made later. I mean, those are the two questions. We have all sorts of cases where you ñ it happens all the time in mediation. Parties agree on principle. They draft up a set of principle points, and then they go draft the documents. And then another fight erupts. And they say, well, we can't agree on this. It might be indemnity. It might be something else. And then the court says, all right, well, I'm going to force the initial agreement that you made, period. Isn't that the question here? No. Here you don't even have the first point. Well, that's ñ I mean, that's why ñ Unlike in the Facebook case where you have a signed document, signed by the parties, agreeing to certain terms that are definite and enforceable. You don't even have that here. And the reason we know you don't have that here is because rather than accept, in your hypothetical, you say they would accept the October 19th terms. They did the opposite. They didn't accept them. Well, they purported to by saying, here's a more fulsome. Now, you would say that's artifice, and they were actually counterclaiming. Of course, in the Valerie ñ in the Valerie Kritzker case, this Court held that congratulatory words as to finally arriving at a deal or, in our case, a monumental accord are meaningless. What you look to is the objective manifestation, and you don't have an agreement where you don't have a mutual meeting of the minds on the material terms of an agreement. And here, the objective evidence proves that. And that's why in summary judgment, the Court was required to find there was no agreement. And there was nothing that they put forward that raised a genuine issue of fact as to contract formation. I'd like to reserve the remainder for rebuttal. Thanks. May it please the Court. Daniel Petruccelli with my colleagues Cassandra Cito and Matt Klein for the D.C. Comics Parties. Turning initially to the issue of this settlement agreement, it's our fundamental position that this was not a matter appropriate for summary judgment and that the Court should have allowed this to go to the trial on the linchpin factual issues of whether or not the parties reached an agreement, and if so, to what. And our position in the court below and in this appeal was that the parties did reach an agreement with the acceptance letter that the plaintiff's lawyer sent to D.C. Comics on October 19, 2001, at S.E.R. 456. This is a detailed recitation of terms written in powerful legal language of acceptance which says, we hereby, the Segal family has accepted D.C.'s Comics offer. And then it goes on to say the terms are as follows. And this was the culmination of two and a half years of back and forth negotiations. And the record before the district court was that this letter was written following a phone call between the two principal negotiators where they resolved the last deal point and the testimony of Mr. Marks, the plaintiff's representative, who was, we are closed. We will send you the document. Mr. Shulman responded, great, we'll start working on a long form. This document is then sent. And a week later, Mr. Shulman responds, and very importantly, this document is sent by one of the most experienced lawyers and one of the most experienced law firms in the country dealing with entertainment contracts. This lawyer, who knows and probably has written thousands of times a reservation of rights that this document is not binding until and unless a long form or a more formal document is executed, says no such thing in this letter. Now, are you talking about Mr. Shulman's letter? No, I'm talking about the acceptance letter, the document that constitutes the contract. That's the letter of October 19, 2001. All right. And then he said, I thought he said that the reply was written by the plaintiff. Okay. I may have misspoken. But in this document, following the conversation with the D.C. representative, there's no indication in here that the parties do not intend to be bound until some future event. There's no reservation. And the testimony in the record is we are closed. Then a week later, Mr. Shulman, the recipient of Mr. Marks' letter and the other negotiator, responds to it. And he states, and I won't characterize it as a counteroffer because I think that's begging the issue. He states, I've received it. I've reviewed it. I enclose herewith for you and Bruce a more fulsome outline of what we believe the deal we've agreed to is.  And then he goes on and fleshes out in more detail the same terms that appear in the October 19 letter and adds some things here and there to be sure, like an indemnity, or he fleshes out a detail on some of these royalty provisions. These are essentially immaterial variations and differences that are the normal part of a process of commencing a long-form document. Now, the error, the fundamental error of analysis here, both by the district court and by Mr. Toberoff, is the fact that this process is going on, that there's now an effort to create a long form. It's dispositive of the conclusion that there is no contract. And that's what the district court ruled. Simply because the parties, after the contract was formed, in the unambiguous acceptance letter, just because of that, the fact that they now endeavor to do a long form, the judge concluded as a matter of law there can be no agreement. And that's just wrong. There are scores of cases. This is an extremely familiar situation where parties believe they've reached a deal. They have a confirmatory letter or document. They go off to prepare the long document. Something happens. Things break down. And one side then says we don't have a deal. Was there any affidavit or information introduced in the district court as to the custom and practice in the industry of reaching an agreement, proceeding with it, and then having the document prepared? There was no custom and practice evidence in the record. But to be sure, that would be highly relevant on the issue. Mr. Shulman had a direct declaration in the record saying that Mr. Martz's letter accurately reflected all the terms of the deal and that he wasn't intending to change anything, and he was just fleshing out the detail. Now, the proof is in the pudding. In response to this letter of October 26th, which the plaintiffs want to suggest is some material departure, they even go so far as to say this is a counteroffer. In response to Mr. Shulman's letter, Mr. Martz never objects. He never reaches out and says, wait a second, you've got a problem. That's not one we've agreed to. Tell me, why, if that's correct, is this a matter for trial rather than summary judgment for you? Well, we did not move for summary judgment in the court below. And you're not asking for that here? Well, we think the record evidence that there is an agreement is so strong that we do think it can support a judgment in our favor. But we, at the very minimum, we believe that we're entitled to a trial. The judge just departed wildly from the summary judgment standard. He drew all adverse inferences against us. He did not understand that the question of whether or not the long-form process does or does not negate a prior agreement is a factual question. Your Honor dealt with that issue, if I may, in the you had a case with Judge McIntyre. The plaintiff was a labor union, and they sued this company, and they had an agreement. They had a handshake agreement, and then they went on to do a long form, and things broke down, and the judge concluded there was no deal as a matter of law. And this Court reversed that, and this Court said that the question of the intent to contract is a fact issue. The question of whether the subsequent events undid the prior agreement or didn't undo the prior agreement, that's a fact question. So are there undisputed facts or not? I mean, I'm not sure I understand your answer, because Judge Reinhart was asking you, is there sufficient evidence to for summary judgment in your favor? And you said, well, yes, but there are fact issues. So I'm not sure. There are. Tell me, aside from the documents themselves, what genuine issues of material fact you would raise. The threshold question of whether the parties intended to be bound by this letter, by this acceptance letter, or whether they intended not to be bound at that time, but only upon such time as they agreed to a long form. We say that they intended to be bound at this time, but that question and all the events that happened, that's evidence that's relevant to the threshold issue of whether or not there was a deal in the first place. It is not dispositive that there was no deal. And so that's the fundamental factual issue. There's a second factual issue, I suppose, and that's what terms the parties agreed to. Well, our position is it's everything in this letter, nothing more. To the extent that Mr. Shulman's letter is perceived to have added terms or suggested new terms, they're not part of the deal. Why isn't that a matter of law that you can decide on the basis of the documents themselves? You can decide as a matter of law that if the parties reach the contract as of October 19, everything thereafter doesn't matter. What can't be decided as a matter of law is that the parties did not reach an agreement. That cannot possibly be resolved against us with this record of direct admissions by the plaintiffs that there was an agreement, not only in the acceptance letter, not only in the no response to Mr. Shulman's letter, thereby indicating there was nothing significant or new or different about it, but there might not have been. The second one was even more fulsome than the first, I guess. Excuse me? The second one was more fulsome than the first. The second one, to be sure, was 50 pages of boilerplate. Yes, but we're not going to take that. Well, except perhaps as the royalty rate. Excuse me? Except perhaps as the royalty rate. Well, on the royalty rate, if you really read the letter between Mr. Shulman and Mr. Marks, they're fleshing out very precise little details about when the royalty rate gets reduced, if multiple characters are involved, if it's a cameo appearance, if it's a special project. I mean, this is why sometimes documents take 50 pages or more. But that's not a material term, the absence of which would negate a contract. And if it were, that itself is a question of fact. And case after case, the importance to which the parties attach to particular terms is a fact question. There was a question to Mr. Toberoff earlier, I think by Judge Reinhart, about whether this document, this contract, this acceptance letter of October 19 has sufficient material terms to constitute a contract. It does. It easily passes the test. I mean, the threshold, as the Facebook case illustrates, is very low, price, term. So there's no question that this document contains sufficient terms that a court could never look at this document and conclude as a matter of law that it's not sufficient to be a contract. Whether there are new and additional terms that the parties wanted and whether that somehow gets added on here or doesn't get on, that's a fact question that takes testimony about the significance to which parties attach to the point that they discuss it in their negotiations. Did they not discuss it? Did they forget to put in something? Did they not forget? And that's the subject of testimony. Counsel has conflated this idea of the objective theory of contracts, which to be sure is how the issue is decided, with rules of evidence about what kind of testimony is admitted in order to prove up intent. All kinds of testimony is admitted, including the custom and practice, including parties' state of mind as to why they did certain things, why they said certain things. So at bottom, we think that this case never should have been thrown out. And importantly, this has the potential to dispose of this entire dispute. Under this agreement, which took three years to negotiate, the plaintiffs would receive an immediate payment of $20 million plus substantial future consideration for the duration of the copyright term, which is 2033, plus medical benefits for the family and all kinds of other benefits. On the other hand, D.C. gets the transfer of the copyright interests that were recaptured by the Siegel family. So they transfer the copyright interests, and they get a lot of money. Well, that's not no need to try to persuade us it's a good deal for them. If they think it's a good deal for them, they wouldn't be here. Well, that's correct, Your Honor, because they believe they had a better deal when someone came along and offered them more, and they then repudiated this agreement. And one final comment, this question about what we did and did not do afterwards, that's a very incomplete recitation that was received, but all of that is simply more relevant evidence on the question of whether the parties at the inception when they made their deal intended to be bound or not. That's just evidence of subsequent conduct of the parties. Whether it bears on the contract formation or not is a relevance issue that's up to the trial judge. But let me ask you this question. I had read your papers to suggest you were seeking summary judgment, but assuming that you're either now only seeking a remand for a trial or that we should independently decide that that's the most you can get, do you think that this Court needs to decide any of the other issues if we remand this case for trial and whether there was an agreement? I believe that since this is potentially dispositive, it does not have to, because if this contract is proven and this contract is enforced, that ends once and for all this dispute. Every issue that is before Your Honors in these very large amount of briefings was all resolved. That's why it took three years to do. This wasn't some initial offer. You may not be the one to answer this question, but just out of curiosity, would it resolve the prior case also? Well, it would have a significant impact, at least on the damages in the prior case. And my view is it would go a long way to resolving that one as well, at least insofar as the Siegel side is concerned. I don't know if I have any time left. You have five minutes. I would like to turn to one other legal issue that's on a totally separate subject, if Your Honors don't have any additional questions on this topic. And that has to do with a decision, a purely legal decision, that the district court below made. And what the court decided was that this very first Superman comic book, which is called Action Comics Number One, S.E.R. 714, the district court decided that since this was largely created by Mr. Siegel and Mr. Schuster long before D.C. came into the picture, this being the character Superman in black and white sketches, that he awarded the copyrights and the various elements in this Action Comics book entirely to the Siegels and Schusters. We said to the judge, we don't challenge that in the main, except for this. We, D.C., back in 1938, came up with the idea of making a comic book. Siegel and Schuster had drawn sketches of Superman for newspaper strips in black and white. We want to create a comic book. We want to put it in color. And we then retained them to do so. It is undisputed that certain elements of this were done by D.C. in concert with Schuster and Siegel, but with their other employees and artists. So we asked the court to declare certain parts of this, certain parts of this, owned by D.C., either as a work-for-hire or as a joint work or other theories of ownership. The court concluded it was precluded from doing so because of a decision back in the 70s in the Second Circuit by D.C.'s predecessor and Siegel and Schuster called the National Case. And the court believed that the National Case was res judicata and or collateral estoppel and prevented D.C. from litigating the issue of whether it had ownership interest in admittedly part of the contributions that it made to Action Comics 1. And I only want to address the court's ruling on collateral estoppel. It was clearly wrong for the following reason, and this is a purely legal issue. The National Case back in the 70s was a lawsuit about who owned the renewal copyright in Action Comics 1, and this was before the new termination legislation came about, the second 28-year renewal term. D.C. contended that it owned the renewal term for two separate and independent reasons. One, the Siegel and Schuster parties transferred full ownership of their Superman elements way back when when they first met with D.C. and a document dated March 1. So they said we own it by contract. Secondly, D.C. said, actually it was National, its predecessor, but I'll just call it D.C. D.C. said we own it because it was work for hire and that we were the author of it and so we own the renewal rights. So they said we own the renewal right for those reasons. The district court agreed on both counts and went up to the Second Circuit. The Second Circuit affirmed on the ground that the conveyance of rights back in 1938 from Siegel and Schuster to D.C. included the conveyance of the rights to the renewal term. And so the decision below was correct and it was affirmed. The Second Circuit then went on to say, however, that the ruling about work for hire was incorrect. And it made some references to the fact that the Superman had been developed before D.C. came along. So how could the entirety of Action Comments 1 be a work for hire? It's that language that the judge, in this case the district court, felt was binding on him. We pointed out below and pointed out in the papers, as a matter of law, that cannot be res judicata or collateral estoppel because that was an adverse determination made in favor of a prevailing party and it was not necessary to the decision and it was dictum. We, for example, never could have appealed that decision. We won. National did. It never could have appealed solely for the purpose of addressing the alternative statement by the Court of Appeal that was adverse to National. And case after case make this clear, including the Fireman's Fund case in the Ninth Circuit. It's true. I'm running out of time. Let me just ask you, is this issue resolved if you win on the summary judgment question? Yes. Everything goes away when you win on summary judgment. Everything, Your Honor. It's the end of this case once and for all. All right. Thank you very much. Thank you very much, Your Honors. Your Honors, Warner Brothers cannot point to any place in 2001 where they accepted the terms set forth in the October 19, 2001, letter from Marks. I don't know how one can find that a contract exists without mutual agreement of both sides. Instead of agreement from Warner Brothers, we have disagreement, as reflected in the October 26th letter and as reflected in Warner Brothers' agreement. It's insane to say this is purely a question of formal documentation of an agreement of the parties when there is the problem. And maybe you can comment on this, Mr. Turov. The problem is that the October 26th letter doesn't reject the October 19th letter. It says, in closing, a more fulsome outline of what we believe the deal we've agreed to is. Now, the argument on the other side is that that says we've agreed to a deal, but we're giving you a more expansive outline of what that deal is. Now, what's the answer to that? The answer to that is whether or not there's a contract is not based on verbiage that says a more fulsome outline. It's based on a comparison of the terms. And anything less than an unequivocal acceptance of an offer is a counteroffer, extinguishing that offer. It's been that way forever in California, and it's still that way in California. So regardless of how you... Take the example of a movie distribution deal or a movie production deal where the parties meet, they agree to the deal, they then start with a movie. Finally, in the middle of the movie, they get down to reducing everything to writing, and there's a disagreement.  Now, is that not an agreement without the written exposition of it? It would depend on the terms of the agreement. Here, and there have been cases about that where one side has argued in California and Hollywood we do lunch, we don't do contracts, and they've rejected those arguments when it came down to specific contract formation issues like this. They cannot point to an acceptance of the terms of the October 19th letter. It depends on who's the offeror and who's the accepting party. What the October 19th letter says, this is to confirm our telephone conversation, it goes on to say in which we accept the DC Comics offer of October 16th. So if there's a legitimate offer on the 16th and they accept it on the 19th, does it really matter what happened after that? Yes, it does. I mean, if there's a contract formation as of this and it's reflected in the letter of the 19th, then there's a deal. But this is an ongoing negotiation that continues into 2002. No, I understand that. And that's acknowledged by all the parties. So you can't artificially limit the analysis to an oral communication on October 16th and a written communication on October 19th. I'm just saying, to my mind at least, I haven't come to rest on it, but it certainly suggests that it's a more complicated situation and therefore there's probably a genuine issue of material fact. I can see none, and I can tell you why, because when he refers to the October 16th teleconference and asks, do you agree that these are the terms, because that's what he says. He says, if I've gotten anything wrong, let me know. He's essentially asking, do you agree, Warner Brothers, that these are the terms, and all they would have to have done is said yes. Then you would have a different situation, and that's not the situation that exists here, and the objective evidence shows that that undisputed evidence shows that that's not the situation that exists here. What it shows is that Warner Brothers says that's not what I believe. They didn't say that. Yes, they did. They said, here's a larger outline. Now, today they say, well, that's essentially the same terms. And you can say, well, it's not the same terms. And, you know, obviously they didn't agree. The parties did not agree on indemnity, period. There's no agreement on indemnity. But the question for the Court is not necessarily whether it was a – the question is whether there was a contract formed before that. Exactly. This isn't – well, there's not a contract formed before that if when he says this is the terms that we believe were discussed. He doesn't just say more full semantics. He says a more full semantics of what we believe the terms are. They then send over a contract and reserve the right of Warner Brothers to revise the terms, and they acknowledge that the Seagulls can also revise the terms. It's not just a matter of these indemnity provisions. I would refer the Court to the – No, I understand that. I'll just give that an example. But, I mean, it often happens where you have a deal reached, a deal letter like this, and then the parties add terms. And they say, well, that's not part of our deal. And then they may agree or disagree on subsequent terms, but that doesn't alter the original agreement or the fact that it's been made. The problem is you have no acceptance to those original terms. The hypothetical doesn't apply here. Unless you say that this – the letter of the 19th accepts an offer of the 16th. And we have a letter from October 26th saying that wasn't the offer, this is what we believe the deals are. Now, I want to draw the Court's attention to a chart in our reply brief below, which impressed the district court who dealt with this in tremendous detail. It's in our reply excerpts at pages 140 to 149, where we outline the material differences. Warner acknowledges that the properties being assigned is an essential term, using words from the Facebook case. Well, the properties in the Marks memo are limited to three properties, Superman, Superboy, Inspector. The properties in Shulman's memo and then in the February 1st agreement concern Superman, Superboy-related properties in anything created for D.C., whether published or unpublished, by Siegel. So there's an expansion of what is even being assigned. Secondly, the royalties. You have a very complex royalty situation here. It's not like in Facebook with a fixed amount of money and a fixed amount of stock. You have a 6 percent royalty, which is reducible to 3 percent, which is then reducible to 1 percent – 1.5 percent to 1 percent as an absolute floor. Warner Brothers drills all sorts of holes in that floor, rendering them illusory and having situations where they would receive no money whatsoever for the exploitation of Superman. These are material contract terms. You can't ignore them. They change the dance between offer and counteroffer, and that's the way contract formation is analyzed in the state of California. Warner Brothers has a situation where if Superman appears in another character's contract, published by D.C. like Green Arrow, for weeks Superman is appearing, but the name is not in the title of the comic book, under Shulman's scenario you would receive a – excuse me, under Mark's scenario you would receive a royalty. Under Warner Brothers' scenario you receive no royalty. It comes as no surprise that all the changes made by Warner Brothers, which they now say are boilerplate and not material, were all decidedly in Warner Brothers' favor and affect the key terms of the agreement. The scope of the properties, the royalties and compensation, the warranties and indemnifications is not a small matter, because what happens with the studios when you enter in a contract and you have substantial contingent compensation and there's any claim by a third party or anything happens which they can claim triggers a warranty, they will withhold your – they will withhold your royalty payments. There are credit provisions where Mark says we want credit in paid ads, because that's very important to his clients and he testifies that to a fact. Warner Brothers' October 26th outline and their loan form says no credit in paid ads. Warner Brothers requires an elderly Joanne Siegel, who's in her late 80s, to go on publicity tours promoting Superman. None of this exists. There's – as they were saying, these are the sort of – the kind of things we put in our contracts. And, you know, that clause isn't drawn for her individual, you know, because they're concerned about her. That's a boilerplate provision. It's not boilerplate to say that the Siegels have to indemnify Warner Brothers for a claim for her ex-husband. And that Joanne Siegel has to go on a tour. You know, those are the kinds of things that have to be worked out after there's a contract. But the royalty provisions and the scope of the properties assigned go to the heart of this. And under Section 204A of the Copyright Act, when you have an assignment of a copyright, it has to be in writing, signed by the assignee. Marx's letter does not assign any copyrights. It says we will, we anticipate signing those contracts. Nobody in this exchange viewed the October 19th letter outlining deal terms or the October 26th letter outlining different deal terms as a binding enforceable contract. Everybody understood that considering the magnitude of these rights and the extent of the rights that are being discussed, that you would have a final written agreement signed by both parties. So how do we determine that as a matter of summary judgment, that everybody understood? Because, because you can't do that without extrinsic evidence of the parties. And you well may be right. I'm just saying if you can't do it on the basis of the documents alone, if you have to rely on what you say is that everybody understood, then that's extrinsic evidence that requires a resolution by a fact finder. I respectfully disagree, Your Honor. If you look at the October 26th of Warner Brothers Communication, it specifically refers we will have this matter drafted in contract form and we will send it to you. So right there you know. Well, that's what happens in all cases. You don't have a. But that's not extrinsic evidence. That's objective evidence saying that the, showing that the parties anticipated that the form of agreement would be a written agreement signed by both parties, and that's what's required by the Copyright Act. That never happened. Then they send it over and they reserve the right to comment. No, but what happens. I don't mean to quarrel with you. I'm just, you know, we're working through these cases. But what often happens when you have a situation like this is the Court will say you have enough for specific enforcement of the terms to which you agreed, and therefore you execute the unnecessary assignments and so forth. The fact that they weren't all executed I don't think is dispositive. Now, you may well be right. I'm just saying that this is a more complicated issue than that. Your Honor, I believe if you peel back the veneer of comments like a deal is a deal and look at the actual facts of this case carefully, you will see that under every single principle in California law about contract formation, this fails as a matter of law. And you can make that determination on this objective exchange of undisputed documents. The parties absolute in the State of California. I think we've explored this fully. And you're seven minutes over. So, I mean, you know, these are not simple issues. And I don't mean that the answer may not be simple. But the cases you say, you know, we're going to, to the extent that we haven't sufficiently read them, we'll certainly explore them all. And, you know, we understand the arguments of both sides. And they're legitimate arguments. So. I'd just like to read you from a memo that you pointed out, Marx's memo, which, by the way, is an extra record document. It shouldn't even be part of this record. But I'd like to read you what Marx actually says in that memo. He says, I believe a deal will be finalized with D.C. Comics, even if this process is not entirely smooth. If the parties cannot reach final agreement, then the negotiations would be terminated. That's what he says in an attorney-client communication that they're saying proves there was a binding contract. Okay. Thank you. Thank you, Your Honor. The case, as argued, will be submitted.
judges: Sedwick, Reinhardt, Thomas